UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 18-30059-MGM |
| | ) | |
| KEVIN A. JOHNSON | ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

Defendant, Kevin A. Johnson, respectfully submits this memorandum for the Court's consideration in connection with his sentencing, scheduled for February 25.

### I. THE SENTENCING GUIDELINE RANGE SET FORTH IN THE PRESENTENCE REPORT IS INCORRECT.

The Presentence Report ("PSR") calculates the sentencing guideline range in this case as 37-46 months. PSR, ¶ 97. This is nearly double the 18-24 month range calculated by the parties. The difference between the two calculations arises from 1) the probation officer's decision to group the two counts separately, PSR, ¶ 40, adding two levels, PSR, ¶ 55, and 2) the addition of two levels for "substantial disruption of public, governmental or business functions or services," PSR, ¶ 42. Without these two additions, the adjusted offense level would be 20, and the total offense level (after a three-level reduction for acceptance of responsibility) would be 17, resulting in a guideline range of 18-24 months.

### A. The Two Counts Have the Same Victim.

The PSR bases its decision to group the two counts separately on application note 3 to U.S.S.G. § 2A6.1. PSR, ¶ 40, Addendum at 27, concluding that the two counts had different victims. We submit that this decision is erroneous.

The facts in *United States v. Norman,* 951 F.2d 1182 (10th Cir. 1991) are comparable to those found here. There, the defendant called an airline on two occasions to falsely report that a

man who was in a relationship with his ex-wife was on board a flight with a firearm and explosives. *Id*. at 1183. The *Norman* court concluded that the two separate calls (relating to two separate flights) should be grouped together because, although they caused indirect harm to the airline and its passengers (in one instance requiring re-routing of a flight and evacuation of the aircraft), the intended victim was the subject of the false claim. *Id.* at 1185.

In this case, both envelopes contained a return address bearing the name "Joker" and an address in Westfield. PSR, ¶¶ 15, 19. Investigators interviewed the resident of that address, who said he had been known by that name in high school, and that he and the defendant had a falling-out that escalated into a physical assault on Johnson. PSR, ¶¶ 27-29. As the *Norman* court concluded, "While the method employed was bizarre, it was surely motivated by Mr. Norman's assumption that immediate and severe consequences would befall Mr. Benkowsky if he were perceived as a threat to the airplane and its passengers." *Norman*, 951 F.2d at 1185. Just as the conduct of the defendant in *Norman* was aimed at "bring[ing] grief" to the subject of the false reports, *id.,* Mr. Johnson's actions attempted to falsely pin blame on a third person. The FBI and Social Security administrations were indirect or secondary victims, like the airline in *Norman*. *Id.* at 1185 n.2. Although the court in *Norman* concluded that the applicable guideline was not U.S.S.G. § 2A6.1, its analysis nevertheless is applicable.

The Tenth Circuit came to a similar conclusion in In *United States v. Chapple*, 198 Fed. Appx. 745; 2006 U.S. App. LEXIS 25242, (10th Cir. 2006) (unpublished), which did involve application of the threats guideline. In *Chapple,* the defendant sent white powder to a company on two separate occasions. In one instance, the powder was found by a company employee; in the other, it was discovered by a postal employee. The appeals court held that the district court committed plain error in grouping the two counts separately, It concluded that those who came

into contact with the envelopes were not the intended targets but were instead indirect or secondary targets, citing application note 2 to U.S.S.G. § 3D1.2. *Chapple*, 198 Fed. Appx. at 751, 2006 U.S. App. LEXIS 25242, \*\*13. *See also United States v. Wilson*, 920 F.2d 1290, 1294 (6th Cir. 1990) (holding there was only one primary victim of the defendant's s telephone calls seeking to obtain a "hit man" to murder his wife).

The introduction to Chapter 3, Part D of the guidelines states the general principle: "When offenses are closely interrelated, group them together for purposes of the multiple-count rules, and use only the offense level for the most serious offense in that group." Further, U.S.S.G. § 3D1.2 instructs courts to group counts when they "involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." Although the packages were received by two different federal agencies, both were aimed at bringing harm to "Joker" and both contained language targeting the FBI. PSR, ¶¶ 15-21. The agencies received the packages on consecutive days. *Id.* Both packages contained handwritten messages on note paper. *Id.* As described by government counsel at the rule 11 hearing on November 6, the one received by the FBI on October 24 "contained a similar message" and "the same unique hand-drawn symbol" as appeared on the one received a day earlier by Social Security. Tr. 11/6/2019 at 38-39.

As the First Circuit has explained:

> The Introductory Commentary to the chapter at issue, U.S.S.G., Ch. 3, Pt. D ("Multiple Counts"), indicates that the grouping rules are meant to serve at least two main objectives. [ ] One such objective is to bundle multi-count indictments into sets of counts that share the same harm or can be otherwise characterized as the same type of wrongful conduct in order "to provide incremental punishment for significant additional criminal conduct." U.S.S.G. Ch. 3, Pt. D, introductory cmt. "Some offenses that may be charged in multiple-count indictments are so closely intertwined with other offenses that conviction for them ordinarily would not warrant increasing the guideline range." *Id.* For example, "embezzling money from a bank and falsifying the related records, although legally distinct offenses,

represent essentially the same type of wrongful conduct with the same ultimate harm, so that it would be more appropriate to treat them as a single offense for purposes of sentencing." *Id.*

Another objective of the guidelines' grouping rules is to limit the effect of prosecutorial choices in the design of the indictment which, by charging multiple offenses intend to exact (or threaten) greater punishment but which, nevertheless, may be fairly characterized with fewer counts and thus punishable by a less sentence.

*United States v. Nedd*, 262 F.3d 85, 90-91 (1st Cir. 2001),[1] quoted in *Chapple,* at 198 Fed. Appx. at 748, 2006 U.S. App. LEXIS 25242, **6.

### B. Application Note 3 of U.S.S.G. § 2A6.1 Carries No Independent Authority.

Congress established the United States Sentencing Commission ("Commission") in the Sentencing Reform Act, and delegated to it the rule-making authority to "devise guidelines to be used for sentencing[.]" *Mistretta v. United States*, 488 U.S. 361, 367 (1989) (citing 28 U.S.C. § 994). The Sentencing Reform Act does not mention commentary to the guidelines. In *Stinson v. United States*, 508 U.S. 36, 43 (1993), the Supreme Court surmised that "[guideline] [c]ommentary, unlike a legislative rule, is not the product of delegated authority for rulemaking[.]" 508 U.S. at 44. Therefore, *Chevron* deference, which applies to an agency's "permissible construction" of an ambiguous statute, does not apply. *Id.*; *see Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

Instead, the *Stinson* Court held, "commentary is akin to an agency's interpretation of its own legislative rules." 508 U.S. at 45. Quoting the standard of deference from *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945), the Court stated, "[P]rovided an agency's interpretation of its own regulations does not violate the Constitution or a federal statute, it must

---

[1] The *Nedd* court held that, on the facts of that case, the counts should be grouped separately. The defendant in that case did not dispute the application of the commentary to U.S.S.G. § 2A6.1.

be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Id.* (citing *Seminole Rock*, 325 U.S. at 414). The Supreme Court later applied *Seminole Rock* deference in *Auer v. Robbins*, 519 U.S. 452, 461 (1997); the standard is more commonly called "*Auer* deference."

Recently, in *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019), the Supreme Court revisited the scope of *Auer* deference "to clear up some mixed messages [the Court] ha[s] sent." 139 S. Ct. at 2414. The Court held that *Auer* deference is permitted only where a regulation is "genuinely ambiguous":

> First and foremost, a court should not afford *Auer* deference unless the regulation is genuinely ambiguous. See *Christensen v. Harris County*, 529 U.S. 576, 588 (2000); *Seminole Rock*, 325 U.S. at 414 (deferring only "if the meaning of the words used is in doubt"). If uncertainty does not exist, there is no plausible reason for deference. The regulation then just means what it means—and the court must give it effect, as the court would any law. Otherwise said, the core theory of *Auer* deference is that sometimes the law runs out, and policy-laden choice is what is left over. See *supra*, at 2412-13. But if the law gives an answer—if there is only one reasonable construction of a regulation—then a court has no business deferring to any other reading, no matter how much the agency insists it would make more sense. Deference in that circumstance would "permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation." See *Christensen*, 529 U.S. at 588. *Auer* does not, and indeed could not, go that far.

*Id.* at 2415 (long-form citations omitted).

Here, the application note to U.S.S.G. § 2A6.1 cannot override the fundamental principles underlying the grouping rules set forth in the guidelines themselves.

### C. The Enhancement for "Substantial Disruption" does not Apply.

The PSR assigns a two-level enhancement under U.S.S.G. § 2A6.1(b)(4) for "substantial disruption" to the Social Security Office. PSR, ¶ 42. This is erroneous. No evidence has been presented regarding the number of people evacuated or the impact on the office's business. *Cf. United States v. Anwar*, 741 F.3d 1134, (10th Cir. 2013) (enhancement affirmed where bomb

threat caused evacuation of 240 people from university building and interruption of 14 classes).

Officials knew within hours that the powder was not hazardous.

> In *Anwar*, the court relied upon the dictionary definitions of "substantial" and "disruption."
>
> "Substantial" is typically defined to mean considerable in amount, quantity, or degree. See, e.g., AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1738 (5th ed. 2011) (defining "substantial" as "[c]onsiderable in importance, value, degree, amount, or extent"); 17 THE OXFORD ENGLISH DICTIONARY 67 (2d ed. 1989) (defining "substantial" as "[o]f ample or considerable amount, quantity, or dimensions"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2280 (1976) (defining "substantial" as "considerable in amount, value, or worth").
>
> Dictionaries generally define "disruption" as an action that interrupts, impedes, or stops. See, e.g., AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 522 (5th ed. 2011) (including "disruption" under "disrupt," which is defined as "[t]o throw into confusion or disorder" or "[t]o interrupt or impede the progress of"); 4 THE OXFORD ENGLISH DICTIONARY 833 (2d ed. 1989) (defining "disruption" as "[t]he action of rending or bursting asunder; violent dissolution of continuity; forcible severance"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 656 (1976) (defining "disruption" as "the state of being disrupted," and defining "disrupt" as "to interrupt to the extent of stopping, preventing normal continuance of, or destroying").
>
> The phrase "substantial disruption of . . . functions or services" therefore suggests a significant interruption of normal activities when measured by scope and time.

*Anwar*, 741 F.3d at 1137. *See also United States v. Dudley*, 463 F.3d 1221, 1226 (11th Cir. 2006) ("The dictionary defines 'substantial' as 'of ample or considerable amount, quantity, size, etc.' Random House Unabridged Dictionary 1897 (2d ed. 1993). It defines 'disruption' as 'forcible separation or division into parts' or 'a disrupted condition.' *Id.* at 569. The word 'disruption' cross-references to 'disrupt,' which means 'to cause disorder or turmoil in.'").

In *United States v. Mohamed*, 459 F.3d 979, 982 (9th Cir. 2006), a bomb threat against several shopping malls required the response of multiple agencies, closed several businesses, affected thousands of people, and resulted in alerts via flyers and media reports warning of "the purported impending attack." This case is a far cry from that scenario.

The PSR points to the decision in *Dudley* as supporting its conclusion, noting that in that case a floor of a courthouse was closed for two hours. PSR, Addendum at 28. But it ignores the fact that the disruption was not limited to the suspension of certain courthouse activities: the judge who was the target of the offense remained under 24-hour guard for two days. *Id.* at 1224-25. No such facts are presented here.

The application of the enhancement is unwarranted in this case, as no showing of a *substantial* disruption has been made.

## II. THE COURT SHOULD IMPOSE A BELOW-GUIDELINE SENTENCE OF TIME SERVED.

Regardless of the how the Court calculates the guideline sentencing range, undersigned counsel submits that a sentence of time served is "sufficient but no greater than necessary" to further the statutory goals of sentencing. 18 U.S.C. § 3551(a). Mr. Johnson has been in custody for nearly 15 months. The low end of the guideline range as calculated by the parties, 18 months, after statutory good time is deducted, would result in incarceration for a total of approximately 15 months and ten days.

Mr. Johnson's conduct in this case was non-violent. His mental health issues are longstanding. Imprisonment will not mitigate but is likely to exacerbate his symptoms. His only criminal history is minor and/or remote. No information has been provided indicating that he presented disciplinary issues while detained in connection with this case.

## III. DEFENDANT OBJECTS TO CERTAIN PROPOSED SUPERVISED RELEASE CONDITIONS.

The PSR recommends that the special conditions of supervised release include, *inter alia,* that Mr. Johnson "must take all medications as directed" and "must participate in a manualized cognitive behavioral treatment program[.]" PSR at 23-24. Defendant objects.

A sentencing court may impose a special condition of supervised release if it

(1) is reasonably related to the factors set forth in [18 U.S.C. §]3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D);

(2) involves no greater deprivation of liberty than is reasonably necessary for the purposes set forth in [18 U.S.C. §] 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D); and

(3) is consistent with any pertinent policy statements issued by the Sentencing Commission pursuant to 28 U.S.C. [§] 994(a).

18 U.S.C. § 3583(d). "[W]hen a court imposes a special condition that invades a fundamental right or liberty interest, the court must justify the condition with compelling circumstances[.]" *United States v. Burns*, 775 F.3d 1221, 1223 (10th Cir. 2014). Requiring a defendant to take psychotropic medication is such a condition. *United States v. Malone*, 937 F.3d 1325, 1327 (10th Cir. 2019) (finding plain error in broad medication requirement).

In *United States v. Williams*, 356 F.3d 1045, 1056 (9th Cir. 2004), the Ninth Circuit held that a judge cannot impose a supervised release condition requiring a defendant to take antipsychotic medication without a fully developed medical record, which the defendant has been given an opportunity to challenge. "An order requiring Williams to take antipsychotic drugs is an unusually serious infringement of liberty that calls for more thorough consideration and justification than the conditions of supervised release this court has previously approved." *Id.* at 1055. The *Williams* court noted that forced medication of a prisoner requires a showing of a compelling need and medical appropriateness. *Id.* No less should be required for a defendant on supervised release. *Id.*

The second challenged condition requires participation "in a manualized cognitive behavioral treatment program, as directed by the Probation Office[.]" This improperly delegates treatment decisions to a probation officer. There has been no showing that such a program would benefit Mr. Johnson, nor is there any indication that the probation officer has the knowledge and

expertise necessary to make that determination. "[I]t is the District Court that must determine, albeit with the advice or opinion of a mental health professional, the type and duration of mental health treatment." *United States v. Mangan*, 306 Fed. Appx. 758, 761, 2009 U.S. App. LEXIS 305 (3rd Cir. 2009) (unpublished).

## CONCLUSION

For the reasons set forth above, the Court should impose a sentence of time served, with two years of supervised release to follow.

Respectfully submitted,

KEVIN JOHNSON
By his attorney,

*/s/ Miriam Conrad*
Miriam Conrad
B.B.O. #550223
Federal Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
Tel: 617-223-8061

CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as nonregistered participants on February 20, 2020.

*/s/ Miriam Conrad*
Miriam Conrad